# EXHIBIT 9

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

## FHFA's Supervision of Freddie Mac's Controls over Mortgage Servicing Contractors



# EXPLANATION OF REDACTIONS IN THIS REPORT

This report includes redactions requested by the Federal Housing Finance Agency and/or the Federal Home Loan Mortgage Corporation. According to them, the redactions are intended to protect from disclosure material that they consider to be confidential financial, proprietary business, and/or trade secret information. They claim further that the redacted information would not ordinarily be publicly disclosed, and, if disclosed, could place the Federal Home Loan Mortgage Corporation at a competitive disadvantage.



# FEDERAL HOUSING FINANCE AGENCY
## OFFICE OF INSPECTOR GENERAL
# AT A GLANCE

## FHFA's Supervision of Freddie Mac's Controls over Mortgage Servicing Contractors

### Why FHFA-OIG Did This Audit

The Federal Housing Finance Agency (FHFA or Agency) was created by the Housing and Economic Recovery Act of 2008 (HERA) to assess the financial safety and soundness and overall risk management practices of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises). The Enterprises routinely purchase mortgages from mortgage originators in order to provide liquidity for continued lending in support of the nation's housing finance system. With respect to the mortgages that they purchase, the Enterprises enter into contracts with mortgage servicers to collect mortgage payments, set aside taxes and insurance premiums in escrow, forward interest and principal payments to the contractually designated party, and respond to payment defaults. As of June 30, 2011, Freddie Mac had a mortgage servicing portfolio containing nearly 12 million mortgages with an unpaid principal balance (UPB) of nearly $1.8 trillion.

Troubled loans have increased substantially since 2008. Mortgage servicers have had to respond to increased defaults by expending extra effort including loan modifications and foreclosure processing. In late 2010, the federal agencies that regulate and supervise banks conducted an interagency review of foreclosure processing at 14 large mortgage servicers. The agencies found critical weaknesses in the mortgage servicers' foreclosure governance processes, foreclosure document preparation procedures, and oversight and monitoring of third-party vendors, including foreclosure attorneys.

In light of these findings, the FHFA Office of Inspector General (FHFA-OIG) initiated a performance audit to assess whether FHFA has an effective supervisory control structure and sufficient examination coverage and oversight activities to adequately and timely identify and mitigate risks involving mortgage servicing contractors. The audit covered FHFA's supervision of Freddie Mac.

### What FHFA-OIG Recommends

FHFA-OIG recommends that the Agency: (1) establish and implement regulations or guidance concerning mortgage servicing oversight and risk management; (2) direct Freddie Mac to take the necessary steps to implement servicer performance metrics for a larger cross-section of servicers, to achieve additional credit loss savings; and (3) improve existing procedures for coordination with other federal agencies that oversee mortgage servicers. The Agency provided comments that are addressed in the report.

Although this audit focused on FHFA's supervision of Freddie Mac, the first and third recommendations generally are applicable to both Enterprises.

### What FHFA-OIG Found

FHFA and Freddie Mac have taken action to improve their oversight of mortgage servicing, but FHFA-OIG noted some areas in which FHFA could further enhance its supervision of the Enterprises' controls over mortgage servicing contractors.

FHFA has not clearly defined its role regarding oversight of servicers, sufficiently coordinated with other federal banking agencies about risks and supervisory concerns with individual servicers, or timely addressed emerging risks presented by mortgage servicing contractors. Moreover, FHFA has not established comprehensive regulations and guidance that provide for servicer management and oversight, and does not adequately monitor servicing performance.

As early as 2008, FHFA had information indicating that mortgage servicing represented a heightened risk to the Enterprises, but FHFA did not begin to devote added attention to servicing issues until August 2010. These emerging risk indicators included the increasing number and dollar value of mortgage payment defaults, the concentration of servicing risk among a limited number of large servicers, the surge in bank failures, and the escalation of enforcement actions against problem banks, many of which were counterparties performing mortgage servicing for Freddie Mac. Further, when FHFA commenced its examination coverage beginning in 2010, it did not adequately assess the operational risks posed by Freddie Mac's servicing contractors, and it did not consider the primary federal regulators' reports of examination and enforcement actions, nor did it consider servicer reviews conducted by other federal agencies.

In light of these control deficiencies, FHFA is not assured that the risk associated with Freddie Mac's servicing operations is being sufficiently managed. In addition, Freddie Mac has implemented a more robust servicer performance management program that it estimates could yield lifetime credit loss savings of up to ▓▓▓▓▓▓, if it were applied across its servicer network. However, Freddie Mac currently does not plan to implement its program for all servicers. FHFA-OIG accordingly believes that FHFA may be able to generate additional funds to be put to better use, beyond what Freddie Mac is currently targeting, by directing the Enterprise to implement its servicer performance management program across a larger cross-section of its servicers.

---

Audit Report: AUD-2012-001        Dated: March 7, 2012

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................................... 4

ABBREVIATIONS ............................................................................................................................. 6

PREFACE ............................................................................................................................................ 7

BACKGROUND ................................................................................................................................. 9

About the Enterprises and FHFA .......................................................................................... 9

Mortgages Owned or Guaranteed by Freddie Mac .......................................................... 9

Overview of Mortgage Servicing .......................................................................................... 10
    What is Mortgage Servicing? ........................................................................................... 10
    Concentration of Mortgage Servicers ........................................................................... 11
    Why Is Mortgage Servicer Performance Important? ................................................... 12

What Is Freddie Mac Doing to Oversee Servicing? ........................................................... 15
    Servicer Oversight and Performance Rating ................................................................ 15
    Servicing Initiative to Minimize Credit Losses ............................................................ 16

What Are Other Federal Regulators Doing to Oversee Servicing? ................................. 17

What Is FHFA Doing to Oversee Servicing? ...................................................................... 18
    FHFA's Statutory Responsibility for Overseeing the Enterprises ............................ 18
    FHFA's Authority over Mortgage Servicers ................................................................ 19
    History of FHFA's Supervision of Mortgage Servicing ............................................. 20

FINDINGS .......................................................................................................................................... 22

1.   FHFA Needs to Strengthen Its Supervision of the Enterprises by Establishing a More Robust Counterparty Oversight and Risk Management Framework ..................................................................... 22
    Contracting with Servicers ............................................................................................... 22
    Reporting Critical Servicer Information ......................................................................... 24
    Establishing Mortgage Servicing Baseline Requirements ........................................... 25

2.   Improvements Started in 2011 by Freddie Mac to Address Servicer Performance Should Be Followed Through ............................................................................................................................. 26

3.   FHFA's Examination Coverage of Freddie Mac's Oversight and Risk Management of Counterparties Needs Improvement ....................................................................................................... 27
    FHFA's Delayed Examination Activities ....................................................................... 28
    FHFA's Assessment of Freddie Mac's Third-Party Risk ........................................... 29

CONCLUSION .................................................................................................................................. 32

RECOMMENDATIONS .................................................................................................................. 33

**SCOPE AND METHODOLOGY** ................................................................................... 34

**Appendix A** ................................................................................................................ 36

    FHFA's Comments on Findings and Recommendations ............................................... 36

**Appendix B** ................................................................................................................ 40

    FHFA-OIG's Response to FHFA's Comments ............................................................. 40

**Appendix C** ................................................................................................................ 42

    Summary of Management's Comments on the Recommendations .................................. 42

**ADDITIONAL INFORMATION AND COPIES** ............................................................ 44

# ABBREVIATIONS

DER.................................................................................... Division of Enterprise Regulation

Fannie Mae........................................................................ Federal National Mortgage Association

FDIC ................................................................................. Federal Deposit Insurance Corporation

FHFA or Agency.................................................................Federal Housing Finance Agency

FHFA-OIG .......................................Federal Housing Finance Agency Office of Inspector General

Freddie Mac .....................................................Federal Home Loan Mortgage Corporation

FRS ...................................................................................Federal Reserve System

GSE ...................................................................................Government-Sponsored Enterprise

HERA.................................................................Housing and Economic Recovery Act of 2008

HUD .................................................................U.S. Department of Housing and Urban Development

MBS ...................................................................................Mortgage Backed Securities

MOU ...................................................................................Memorandum of Understanding

OCC ................................................................. Office of the Comptroller of the Currency

OCR ..................................................................................Office of Credit Risk

OFHEO ................................................Office of Federal Housing Enterprise Oversight

OTS...................................................................................Office of Thrift Supervision

PFR ...................................................................................Primary Federal Regulator

REO....................................................................................Real Estate Owned

TBW................................................................. Taylor, Bean & Whitaker Mortgage Corp.

Treasury ...................................................................................U.S. Department of the Treasury

UPB....................................................................................Unpaid Principal Balance

Federal Housing Finance Agency

Office of Inspector General

Washington, DC

---

# PREFACE

FHFA-OIG was established by HERA,[1] which amended the Inspector General Act of 1978.[2] FHFA-OIG is authorized to conduct audits, investigations, and other activities of the programs and operations of FHFA; to recommend policies that promote economy and efficiency in the administration of such programs and operations; and to prevent and detect fraud and abuse in them.

The objective of this performance audit was to assess whether FHFA has an effective supervisory control structure and sufficient examination coverage and oversight activities to adequately and timely identify and mitigate risks related to Freddie Mac's controls over mortgage servicing contractors.

The audit noted opportunities for further improving FHFA's supervision of the Enterprises' controls over mortgage servicing contractors. Specifically, FHFA needs to continue to (a) identify opportunities to enhance its regulations or guidance to the Enterprises regarding counterparty contracting for mortgage servicing, including a contract provision authorizing FHFA's access to servicer information; and (b) consider additional efforts to enhance FHFA's supervision of Freddie Mac's oversight of its mortgage servicing contractors.

FHFA-OIG believes that the recommendations in this report will help the Agency develop and adopt more economical, effective, and efficient operations. FHFA-OIG appreciates the assistance of all those who contributed to the audit.

This audit was led by Heath Wolfe, Audit Director, who was assisted by Menjie Medina, Audit Manager.

---

[1] Public Law No. 110-289.

[2] Public Law No. 95-452.

This report has been distributed to Congress, the Office of Management and Budget, and others and will be posted on FHFA-OIG's website, http://www.fhfaoig.gov.

Russell A. Rau
Deputy Inspector General for Audits

# BACKGROUND

## About the Enterprises and FHFA

On July 30, 2008, HERA was enacted and it made FHFA the regulator of the housing-related government-sponsored enterprises (GSEs): Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. FHFA's mission is to promote the GSEs' safety and soundness, support housing finance and affordable housing goals, and facilitate a stable and liquid mortgage market. HERA also expanded the authority of the U.S. Department of the Treasury (Treasury) to provide financial support to the Enterprises.

On September 6, 2008, FHFA became conservator of Fannie Mae and Freddie Mac, and at the same time Treasury began providing the Enterprises with substantial financial support.[3] As conservator, FHFA preserves and conserves the assets of the Enterprises, ensures that they focus on their housing mission, and facilitates their financial stability and emergence from conservatorships.

On October 12, 2010, FHFA's first Inspector General, Steve A. Linick, was sworn in and FHFA-OIG commenced operations. This audit followed and covers the time period from January 1, 2010, through May 31, 2011 (the period was expanded as necessary).[4]

## Mortgages Owned or Guaranteed by Freddie Mac

Freddie Mac (along with Fannie Mae) is in the business of supporting the secondary residential mortgage market by purchasing millions of home mortgages originated by banks and other financial institutions. Mortgage sellers may use the sales proceeds received from the Enterprises to fund additional loans to borrowers. The Enterprises pool most of these mortgages into mortgage backed securities (MBS) for sale to investors, and provide credit guarantees on the MBS. They also hold mortgages in their investment portfolios.

As of June 30, 2011, Freddie Mac owned or guaranteed 11,954,353 single-family mortgages. with a combined UPB of nearly $1.8 trillion. Although 92% of these mortgages are fixed rate

---

[3] Treasury provides financial support to the Enterprises by purchasing their preferred stock pursuant to Senior Preferred Stock Purchase Agreements. As of the third quarter of 2011, Treasury had provided approximately $183 billion to the Enterprises.

[4] Because FHFA's policies, procedures, and controls for supervising Fannie Mae's mortgage servicing contractors are the same as those applicable to Freddie Mac, the audit issues identified in this report can generally apply to both of the Enterprises.

mortgage loan products, 32% of them are non-traditional loans.[5] The majority of Freddie Mac's non-traditional loans in its portfolio were originated and purchased during the 2004 – 2007 housing boom. Those loans have a higher risk than traditional fixed rate mortgages and, with the end of the housing boom and continuing fragility in the housing market, have a greater propensity to default. Such defaults have caused billions of dollars of credit losses to date to the Enterprises and will continue to pose a credit risk for them. Whether these loans default is critical to the Enterprises' ongoing operations, and the rate of default is influenced by the quality of loan servicing.

## Overview of Mortgage Servicing

### What is Mortgage Servicing?

With respect to the loans that the Enterprises guarantee or hold in their portfolios, they enter into contracts with mortgage servicing companies to manage the day-to-day servicing of the loans.[6] These mortgage servicers perform a variety of duties for the Enterprises, including:

- Collecting mortgage payments and processing late payments;

- Sending periodic statements to borrowers;

- Maintaining escrow accounts to pay property taxes and insurance;

- Forwarding payments to mortgage owners; and

- Handling default proceedings and foreclosures.[7]

The mortgage servicers are typically compensated on the basis of a percentage of the UPB of the mortgage loans that they manage.

Both Enterprises have developed their own mortgage servicer guides, which outline the servicers' duties and responsibilities.[8] These servicer guides are incorporated by reference in the

---

[5] Non-traditional mortgage products include interest-only, Alt-A, and option adjustable rate mortgages, and loan categories are not mutually exclusive.

[6] Mortgage servicing companies are also called servicers, mortgage servicers, or mortgage servicing contractors. Further, servicers can be insured depository institutions, such as banks, or non-banking institutions, such as mortgage companies.

[7] Mortgage servicers fall into one of two groups: servicers or seller/servicers. Mortgage servicers that do not originate loans but service loans for the Enterprises often are called servicers. Mortgage servicers that sell and service loans for the Enterprises frequently are called seller/servicers.

[8] The Enterprises' requirements for selling and servicing mortgages are incorporated in the same documents. For purposes of this report, only the servicing requirements are relevant.

Enterprises' servicing contracts. The Enterprises' respective mortgage servicer guides generally contain similar topical areas, but their specific requirements vary. For example, prior to the implementation of FHFA's Servicing Alignment Initiative,[9] Freddie Mac and Fannie Mae required significantly different procedures for servicing delinquent mortgages.[10] Fannie Mae's and Freddie Mac's foreclosure timelines differed both in the terms of unit of measurement (i.e., months vs. days) and actual goals (e.g., Fannie Mae's goal for Kansas was 4 months and Freddie Mac's goal was 180 days). Foreclosure timelines have been unified with the implementation of the Servicing Alignment Initiative.

Due to the sheer volume of approved servicers, the Enterprises largely accept in good faith that the servicers are managing loans in accordance with the Enterprises' servicing guides. However, if the Enterprises suffer a credit related loss and they discover that the servicers did not follow one or more of their requirements, then they may seek a remedy to mitigate their losses. These remedies may include requiring a servicer to purchase a loan at its current UPB or make an Enterprise whole for any credit losses realized with respect to a loan.

### Concentration of Mortgage Servicers

As of June 30, 2011, Freddie Mac had 1,457 mortgage servicers.[11] For the same time period, Fannie Mae had 1,498 mortgage servicers and a loan portfolio of $2.7 trillion.

In contrast to the large number of servicers it employs, the majority of Freddie Mac's loan portfolio is serviced by a select few servicers. As of June 30, 2011, the market share of Freddie

---

[9] On April 28, 2011, FHFA introduced the Servicing Alignment Initiative, which seeks to establish consistent, transparent standards for servicing delinquent mortgage loans that the Enterprises own or guarantee. *See* FHFA, *Fannie Mae and Freddie Mac to Align Guidelines for Servicing Delinquent Mortgages* (Apr. 28, 2011), available at www.fhfa.gov/webfiles/21190/SAI42811Final.pdf. The new directive includes cash incentives for exemplary performance, as well as monetary penalties for underperformance. It addresses four aspects of delinquent loan servicing: borrower contact, delinquency management practices, loan modifications, and foreclosure timelines. With respect to loan modifications, the servicers are required to conform their performance to guidelines previously published by the Enterprises. *See, e.g.*, Fannie Mae, *Servicing Guide Announcement SVC 2011-03: Updates to Fannie Mae's Mortgage Modification Requirements* (Apr. 4, 2011). Fannie Mae's guidelines provide standards for evaluating borrowers for modifications, permissible lengths for modification trial periods, documentation requirements, and credit bureau reporting. According to FHFA, the Servicing Alignment Initiative is intended to provide superior service to borrowers with clearer and more consistent borrower communications, efficient processing of loan modifications, a fair foreclosure process, increased servicer accountability, and, ultimately, reduced taxpayer losses through improved loan servicing.

[10] An inter-agency effort among the federal regulators – the Office of the Comptroller of the Currency, Federal Reserve System, Federal Deposit Insurance Corporation. FHFA. and the Bureau of Consumer Financial Protection – is under way to create a comprehensive set of national servicing standards for the industry, but the implementation date of this initiative is yet to be determined as of February 2012.

[11] Using Freddie Mac's servicer account numbers, the total number of servicers is 1,457. However, numerous servicers have affiliates or subsidiaries that perform servicing duties, and when these affiliated entities are grouped together the number of distinct servicer "families" totals 1,215.

Mac's four largest mortgage servicers (*i.e.*, Wells Fargo, Bank of America, JPMorgan Chase, and Citigroup) was 60% (*i.e.*, $1.07 trillion of the nearly $1.8 trillion in UPB).[12] Moreover, the 10 largest servicers manage 80% of Freddie Mac's and 76% of Fannie Mae's loan portfolio, respectively. Additionally, Freddie Mac and Fannie Mae do business with many of the same servicers. According to the Enterprises' records, approximately 333 servicers work for both of the Enterprises. These servicers manage 84% (*i.e.*, $1.5 trillion) of Freddie Mac's and 81% (*i.e.*, $2.2 trillion) of Fannie Mae's loan portfolios, respectively. The significant amount of servicing business concentrated among so few servicers poses a safety and soundness concern to the Enterprises. If one or more of the largest servicers were to cease servicing operations, or if the Enterprises were to transfer servicing rights, they could find it difficult to obtain alternative servicers capable of handling a large amount of business. Moreover, servicers with a heightened degree of supervisory concern (*i.e.*, a CAMELS rating of "3" or above)[13] manage 30% of Freddie Mac's loan portfolio (*i.e.*, $541 billion of the nearly $1.8 trillion in UPB).

### *Why Is Mortgage Servicer Performance Important?*

From the onset of the Enterprises' conservatorships in September 2008 to the third quarter of 2011, Treasury has invested $183 billion in them.[14] This financial support is needed to prevent their insolvency and offset their losses, which have been historically high in the past three years. Figure 1 on the next page shows the Enterprises' annual revenues, credit-related losses, and withdrawals of funds from Treasury during the conservatorships.

---

[12] Fannie Mae's experience was nearly identical in terms of its largest servicers (*i.e.*, Bank of America, Wells Fargo, JPMorgan Chase, and Citigroup) and their market share (*i.e.*, 61%: $1.643 trillion of the $2.703 trillion in UPB).

[13] The federal banking regulators conduct examinations of the banking institutions under their purview and assign CAMELS ratings to them based on the results of their examinations. The components of CAMELS ratings are: Capital adequacy, Asset quality, Management, Earnings, Liquidity, and Sensitivity to market risk. CAMELS ratings range from 1 to 5 with 1 being the strongest and 5 being the weakest. A rating of 3 or higher denotes institutions with a heightened degree of supervisory concern.

[14] FHFA projects that Treasury's investment in the Enterprises will increase to between $220 billion and $311 billion through the close of calendar year 2014. The Federal Reserve also took steps to support the Enterprises, such as purchasing up to $1.14 trillion of their securities as of December 31, 2011.

**Figure 1: Single-Family Credit Guarantee Segment Results and Treasury Withdrawals (in billions)[15]**

| | Freddie Mac | | | | | Fannie Mae | | | | | Combined 2008-3Q11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | YTD 3Q11 | Total | 2008 | 2009 | 2010 | YTD 3Q11 | Total | |
| Revenue | $5 | $4 | $5 | $3 | $18 | $9 | $9 | $2 | $4 | $24 | $42 |
| Credit-related Expenses[16] | ($17) | ($29) | ($19) | ($10) | ($76) | ($28) | ($51) | ($26) | ($22) | ($127) | ($203) |
| Net Income (loss) | ($20) | ($27) | ($16) | ($8) | ($71) | ($27) | ($64) | ($27) | ($19) | ($137) | ($209) |
| Amount of Funds Requested from Treasury[17] | $45 | $6 | $13 | $7 | $71 | $15 | $60 | $15 | $22 | $112 | $183 |

From 2008 through the third quarter of 2011, Freddie Mac reported a total of $76 billion in credit-related expenses, one of the primary elements of its net operating losses. These credit expenses are directly attributable to the collapse of the housing market and the rise in delinquencies and resulting foreclosures.[18]

Starting in 2008, troubled loans increased precipitously. For instance, from the first quarter of 2008 through the fourth quarter of 2010, the number of seriously delinquent loans owned by Freddie Mac increased from 95,000 to 453,000, or 376% as shown in Figure 2 on the next page.

---

[15] Source: FHFA 3rd Quarter of 2011 Conservator's Report, and Treasury and Federal Reserve data as of January 2, 2012. The totals cited in Figure 1 above may not add together due to rounding.

[16] Credit related expenses are provisions for credit losses plus foreclosed property expenses.

[17] Excludes $1 billion liquidation preferences obtained by Treasury from each Enterprise upon initiation of the Senior Preferred Stock Purchase Agreements. The initial $2 billion are not draws on the Treasury's commitment under the agreements, and, thus, are not included in the $183 billion figure.

[18] In addition, poor servicer performance may contribute to the Enterprises' credit losses or, put another way, good servicer performance may reduce credit losses.

## Figure 2: Freddie Mac's Mortgage Performance (in thousands)[19]

| Description | 1Q08 | 2Q08 | 3Q08 | 4Q08 | 1Q09 | 2Q09 | 3Q09 | 4Q09 | 1Q10 | 2Q10 | 3Q10 | 4Q10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loans Serviced | 12,397 | 12,418 | 12,458 | 12,316 | 12,222 | 12,191 | 12,269 | 12,225 | 12,220 | 12,156 | 11,950 | 11,784 |
| Seriously Delinquent Loans[20] | 95 | 115 | 152 | 212 | 295 | 352 | 421 | 487 | 505 | 481 | 454 | 453 |
| Percent of Seriously Delinquent Loans | 0.77% | 0.93% | 1.22% | 1.72% | 2.41% | 2.89% | 3.43% | 3.98% | 4.13% | 3.96% | 3.80% | 3.84% |

As a result of deteriorating market conditions and increasing delinquencies, mortgage servicers began to process more loan modifications and initiate more foreclosure proceedings than had been the norm in the past.[21] As shown in Figure 3 below, loan modifications and foreclosures substantially increased from the first quarter of 2008 to the third quarter of 2010.

### Figure 3: Loan Modifications and Foreclosure Data for the Enterprises[22]



---

[19] Source: FHFA's Foreclosure and Prevention and Refinance Report, First Quarter of 2011.

[20] All loans in process of foreclosure and loans that are three or more payments delinquent (includes loans in process of bankruptcy).

[21] Loan modifications are common forms of loss mitigation, and involve a negotiated amendment to an existing mortgage. Typical modifications include extending the mortgage's maturity date, adding past-due payments to the end of the mortgage, and making both permanent and temporary interest rate reductions. In most cases, when appropriately applied, these measures will lower the borrower's re-amortized monthly mortgage payment to a more affordable level.

[22] Source: FHFA's Foreclosure and Prevention and Refinance Report, First Quarter of 2011.

Federal Housing Finance Agency Office of Inspector General • AUD-2012-001 • March 7, 2012

14

Given these trends, mortgage servicing is critically important to the financial health of the Enterprises. And, as discussed below, Freddie Mac has concluded that modest improvements in servicing, such as increasing the percentage of delinquent loans that are successfully modified and avoiding foreclosure, can reduce credit losses.

## What Is Freddie Mac Doing to Oversee Servicing?

### Servicer Oversight and Performance Rating

Prior to 2011, servicing oversight-related functions were dispersed throughout Freddie Mac's various business operations. In the third quarter of 2010, Freddie Mac created the Single Family Portfolio Management Division as well as several new units to manage the performance of its servicing portfolio and to oversee the management of its servicers. This was done to implement a more holistic servicing approach, one that is capable of managing all aspects of the Enterprise's servicing portfolio including performing loans, non-performing loans, and real estate owned (REO).

In July 2011, Freddie Mac also implemented its enhanced Servicer Success Scorecard, which redefines Freddie Mac's expectations of quality and responsible servicing. The Servicer Success Scorecard replaced its Servicer Performance Tier rating in order to better measure servicer performance in the current servicing environment. According to Freddie Mac's Servicing Success Program publication, dated August 2011, all servicers receive monthly scorecards, which measure their performance against the established performance criteria. Additionally, for servicers with large servicing books and high volume, their scorecard includes an additional component of individualized objectives and goals as well as Freddie Mac's Servicer Success Account Plan.[23] A servicer's performance is considered to be unacceptable if the servicer ranks in the bottom 25% of all ranked servicers (after taking into account other factors such as portfolio composition, concentration of high-risk mortgages, trends in performance, adequacy of staffing, audit results, and compliance with the purchase documents).[24] In contrast with the Servicer Performance Tier rating, servicers are not ranked against other servicers; instead, scores in their respective performance rating categories are aggregated to arrive at their tier ratings.

---

[23] Through account plans, Freddie Mac currently monitors servicers' performance toward accomplishment of Freddie Mac's loan modification goals set out in its 2011 Business Plan (*see below*). However, to the extent that a servicer has not been placed on an account plan, it is unclear if Freddie Mac is assessing servicers' performance against their target, and if so, according to what standard.

[24] Freddie Mac Bulletin Number 2011-13, dated July 25, 2011.

Freddie Mac has historically rated mortgage servicer performance using a four-tier methodology: Tier 1 (Superior), Tier 2 (Good), Tier 3 (Below Standard), and Tier 4 (Unacceptable). According to its recent servicer performance profile record, Freddie Mac rated the overall performance of its ▮▮▮▮▮ servicers as below standard or unacceptable between January 2009 and December 2010. FHFA has not taken specific actions to address the performance ratings of Freddie Mac's ▮▮▮▮▮ servicers, but the Enterprise has addressed the servicers' performance shortcomings through account plans executed in March 2011. Account plans establish the specific actions to be taken by each servicer and the metrics used to assess success in accomplishing those actions.

While the distressed housing market undoubtedly influenced servicers' performance, documentation provided by Freddie Mac strongly suggests that weak servicer oversight and risk management played a significant role in the unsatisfactory performance. An FHFA review corroborates this conclusion. FHFA noted that numerous GSE executives have indicated that servicer performance would be much improved if the Enterprises were to take a more aggressive approach with respect to their servicers.

### Servicing Initiative to Minimize Credit Losses

In January 2011, Freddie Mac implemented procedures to improve servicers' operational performance and compliance with the Enterprise's servicing guidelines. To that end, Freddie Mac developed a servicing Business Plan, and projected that the plan will achieve lifetime credit loss savings of up to ▮▮▮▮▮ through foreclosure alternatives such as loan modifications and short sales by all of its servicers.

The Business Plan proposes to improve servicer performance and reduce credit losses by enhancing Freddie Mac's engagement with its largest servicers,[25] improving its internal operations, and promoting foreclosure alternatives. The latter objective – namely, encouraging expanded use of loan modifications and short sales – is expected to generate most of the credit loss savings. As of September 30, 2011, Freddie Mac suffered an average credit loss on each foreclosed loan of approximately 50% of the loan's UPB.[26] Thus, avoiding foreclosure through a

---

[25] Freddie Mac plans to provide its servicers with tactical action plans and tools designed to improve loss mitigation processes.

[26] The 50% average credit loss on a foreclosed loan (*i.e.*, severity rate) represents the "all in" costs, which include the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties, as well as interest and capitalized expenses, and other expenses such as property maintenance costs and recoveries from credit enhancements such as mortgage insurance.

loan modification potentially can generate significant credit loss savings and the Business Plan projects ████████ in credit savings through loan modifications alone.[27]

Freddie Mac estimates that credit losses on its nearly $1.8 trillion portfolio will be ████████ if no strategic changes are implemented. However, under the 2011 Business Plan, it projects that if its servicers can accomplish ████████ loan modifications, then credit losses will decrease to ████████. Further, if its servicers can generate ████████ additional loan modifications, then its credit losses will decrease to ████████. In other words, Freddie Mac estimates that ████████ loan modifications undertaken by all of its loan servicers will generate savings of approximately ████████. Freddie Mac is in an excellent position to achieve that goal given that its servicers accomplished substantially more loan modifications last year.

To facilitate more loan modifications, Freddie Mac continues to place greater emphasis on all of its servicers increasing their loss mitigation efforts. For example, servicers' performance metrics for loss mitigation accounted for 50% in 2010 and only included one metric. In 2011, loss mitigation accounted for 60% and included multiple metrics.[28]

However, Freddie Mac has not implemented its Business Plan in its entirety, and FHFA-OIG believes that the Enterprise can enhance its results by implementing its loss mitigation goals among all – or at least a greater cross-section – of its servicers.

## What Are Other Federal Regulators Doing to Oversee Servicing?

Many mortgage servicers are banks that are overseen by federal banking regulators.[29] During the fourth quarter of 2010, the primary federal regulators (PFRs) of these banks – the Office of the Comptroller of the Currency (OCC), the Federal Reserve System (FRS), the Office of Thrift Supervision (OTS),[30] and the Federal Deposit Insurance Corporation (FDIC) – initiated an interagency review of foreclosure policies and procedures.[31] The PFRs conducted on-site reviews at 14 federally regulated mortgage servicers[32] and found that there were critical

---

[27] A short sale may involve a credit loss if the sales price is less than the UPB. Freddie Mac's projection of savings of as much as ████████ also includes ████████ of savings based upon expected improvement in its average loss rates on loans (the severity rate) through other foreclosure alternatives such as short sales.

[28] The only metric used in 2010 was "Workout to REO Ratio." In 2011, two metrics were added: "Early Collections Roll Rate" and "Late Collections Roll Rates."

[29] Some mortgage servicers are not subject to review by the primary federal regulators.

[30] On July 21, 2011, OTS was dissolved into the OCC.

[31] *Interagency Review of Foreclosure Policies and Practices* (April 2011), available at http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

[32] The PFRs conducted foreclosure-processing reviews at Ally Bank/ GMAC, Aurora Bank, Bank of America, Citigroup, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo. Each of these servicers works for Freddie Mac, and 13 of them work for Fannie Mae as well.

weaknesses in the mortgage servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys. As a result of these deficiencies, the regulators took formal enforcement actions against each of the mortgage servicers. The enforcement actions required the servicers to improve their foreclosure processes. Further, the mortgage servicers have to conduct a more complete review of certain aspects of foreclosure actions that were pending between January 1, 2009, and December 31, 2010, to identify borrowers that were financially harmed by the deficiencies and to provide remediation to those borrowers where appropriate.

## What Is FHFA Doing to Oversee Servicing?

### FHFA's Statutory Responsibility for Overseeing the Enterprises

FHFA is responsible for overseeing the prudential operations of the Enterprises and ensuring that they operate in a safe and sound manner, including maintaining adequate capital and internal controls.[33] FHFA uses a risk-based approach to ensure that the Enterprises operate in a safe and sound manner. Each year, FHFA prepares an annual supervisory plan to document:

- The specific areas that the Agency will focus on during the year; and

- The examination activities that will be conducted to ensure that the Enterprises operate in a safe and sound manner.[34]

FHFA developed a Supervision Handbook, a Supervisory Guide, and Reference and Procedures Manuals to describe its processes for supervising the Enterprises. The Supervision Handbook explains the philosophy and methods used by the Agency in carrying out its mission, and the Supervisory Guide provides a more detailed description of FHFA's examination process. The Reference and Procedures Manuals include general procedures for the examiners to follow to determine whether the Enterprises are providing appropriate oversight over third parties, such as mortgage servicers.

Additionally, the Enterprises are subject to regulations promulgated by FHFA and its predecessor agency, the Office of Federal Housing Enterprise Oversight (OFHEO). No existing regulations expressly govern counterparty contracting or third-party relationship risk

---

[33] *See* 12 U.S.C. § 4513.

[34] For purposes of this report, the term "supervisory plan" includes the supervisory strategies, examination plans, and related documents that define the objectives, scope, and methodology for examination and monitoring activities to be performed by FHFA at an individual GSE.

management, but in June 2011 FHFA issued a proposed rule outlining requirements for managing credit and counterparty – including servicers – risk.[35]

In September 2008, FHFA placed the Enterprises into conservatorships. As conservator, FHFA has the powers of the Enterprises' management, boards of directors, and shareholders. Although FHFA has very broad authority as conservator, FHFA does not manage every aspect of the Enterprises' operations. Rather, the Enterprises continue to operate as for-profit corporations, continue to make public filings with the Securities and Exchange Commission, and are responsible for their own day-to-day operations. When FHFA placed them into conservatorships, it replaced and reconstituted the Enterprises' boards of directors and charged them with ensuring that normal corporate governance practices and procedures were in place. The new boards are responsible for carrying out board functions, but they are subject to FHFA review and approval of particular matters.

### *FHFA's Authority over Mortgage Servicers*

FHFA lacks express statutory authority to regulate directly the Enterprises' mortgage servicers. However, if a servicer is an "entity-affiliated party,"[36] the Agency can take enforcement action against it, if needed, to protect the interests of the Enterprises, as follows:[37]

> If, in the opinion of the Director, a regulated entity or any entity-affiliated party is engaging or has engaged, or the Director has reasonable cause to believe that the regulated entity or any entity-affiliated party is about to engage in an unsafe or unsound practice in conducting the business of the regulated entity or the Office of Finance, or is violating or has violated, or the Director has reasonable cause to believe is about to violate, a law, rule, regulation, or order, or any condition imposed in writing by the Director in connection with the granting of any application or other request by the regulated entity or the Office of Finance or any written agreement entered into with the

---

[35] *See* 76 Fed. Reg. 35791 (June 20, 2011), available at http://www.gpo.gov/fdsys/pkg/FR-2011-06-20/pdf/2011-15100.pdf.

[36] The term "entity-affiliated party" is defined to include agents for the Enterprises as well as any person, as determined by the Director (by regulation or on a case-by-case basis) that participates in the conduct of affairs of a regulated entity. *See* 12 U.S.C. § 4502(11).

[37] Although FHFA does not have direct supervisory authority over the servicers, federal and state regulators have authority over some servicers. For example, the federal banking regulators, such as OCC, FRS, and FDIC, have explicit statutory authority over national banks, state member banks, and federally insured non-member state-chartered banks and savings banks, respectively, and these entities service the majority of loans in the Enterprises' portfolios.

Director, the Director may issue and serve upon the regulated entity or entity-affiliated party a notice of charges.[38]

## History of FHFA's Supervision of Mortgage Servicing

FHFA is required by statute to establish for each regulated entity standards relating to the management of credit and counterparty risk, including systems to identify concentrations of credit risk and prudential limits to restrict exposure of the regulated entity to a single counterparty or group of related counterparties.[39] OFHEO took steps in that direction by instructing the Enterprises to establish and implement policies and procedures to assess and monitor credit risks.[40] But, as discussed in Finding 1 of this report, neither OFHEO nor FHFA has established sufficiently detailed regulations or guidance governing counterparty risk.

Instead, FHFA has relied on Fannie Mae and Freddie Mac to establish their own minimum servicing requirements, and the Agency has monitored the Enterprises' efforts. Beginning in 2008, FHFA monitored servicing through continuous supervision, which includes passive activities such as offsite reviews of Enterprise-prepared management or board reports and assessments of economic or industry trends and emerging issues. This is in contrast to a targeted examination or special project in which the regulator typically performs onsite examination procedures including verification and testing of data relating to areas of heightened risk. Since August 2010, FHFA has expanded its focus on mortgage servicing through special projects. Between August 2010 and early 2011, FHFA initiated four reviews that touched upon Freddie Mac's oversight and risk management of its servicers.[41] Later, in April 2011, FHFA initiated a continuous supervision activity of Freddie Mac's oversight of its servicers.

*Targeted Examinations* *are in-depth focused evaluations of a specific risk or risk management system*

*Continuous Supervision is a wide range of ongoing activities designed to monitor and analyze an Enterprise's overall business profile, including any trends or associated emerging risks*

*Special Projects are all other examinations or activities, with the exception of remediation*

---

[38] See 12 U.S.C. § 4631(a)(1).

[39] See 12 U.S.C. § 4513b(a)(9).

[40] The applicable requirements are set forth at 12 C.F.R. Part 1720 (Appendix A) and OFHEO Policy Guidance No. PG-00-001.

[41] The projects include: (1) a review of Freddie Mac's network of foreclosure attorneys; (2) a review of operational risk in the Home Affordable Modification Program; (3) a review of Freddie Mac's process for ensuring that servicers maintain proper insurance coverage; and (4) a review of whether the Enterprises assess penalties against servicers that fail to comply with foreclosure deadlines.

Furthermore, in response to the substantial increase in delinquent mortgages, FHFA has taken a number of actions. For example, FHFA worked with the Enterprises and Treasury to implement the Making Home Affordable programs, which were initiated to help millions of homeowners avoid foreclosure. Moreover, FHFA is involved in interagency initiatives intended to create a comprehensive set of uniform mortgage servicing standards. FHFA also directed the Enterprises to: (1) implement a four point policy framework for handling foreclosure process deficiencies; (2) align their guidelines for servicing delinquent mortgages; and (3) work on a joint initiative, in coordination with FHFA and the U.S. Department of Housing and Urban Development (HUD), to consider alternatives for future mortgage servicing compensation structures for single-family mortgage loans.

# FINDINGS

FHFA-OIG finds that:

## 1. FHFA Needs to Strengthen Its Supervision of the Enterprises by Establishing a More Robust Counterparty Oversight and Risk Management Framework

Although it has undertaken affirmative measures, FHFA has not developed sufficient regulations or guidance governing the Enterprises' oversight and risk management of counterparties, such as servicers. The Safety and Soundness Act generally requires FHFA to issue regulations, guidance, and orders that are necessary to carry out its safety and soundness mission.[42] In addition, the Safety and Soundness Act specifically requires that FHFA establish standards relating to the management of credit and counterparty risks.[43]

However, FHFA, unlike federal banking regulators, generally has not issued sufficient regulations or guidance governing the Enterprises' contracting with servicers. Specifically, FHFA has not established and implemented effective Enterprise regulations or guidance controlling:

- Reporting critical servicer information; and

- Establishing baseline requirements for mortgage servicing.

Instead, FHFA relies on the Enterprises individually to monitor counterparty risk as part of their ongoing risk management activities. And, similar to FHFA's reliance on Fannie Mae and Freddie Mac, the Enterprises routinely rely on mortgage servicers to manage the loans in their portfolios. Although reliance on servicers can assist the Enterprises to attain their strategic objectives, it can also present risks if not properly managed.

*Contracting with Servicers*

Federal banking regulators have established comprehensive regulations or guidance that provide a general framework for servicer oversight and risk management.[44] FHFA has not. FHFA

---

[42] *See* 12 U.S.C. § 4526.

[43] *See* 12 U.S.C. § 4513b.

[44] *See, e.g.,* OCC (OCC Bulletin 2001-47, *Third Party Relationships*) and the FDIC (Financial Institutions Letter-44-2008, *Guidance for Managing Third-Party Risk*).

should consider developing a comparable risk management framework to ensure that the Enterprises implement effective risk management strategies.

Additionally, FHFA's ability to supervise the Enterprises' servicer risk may be impaired by its lack of direct access to servicer books and records relating to the Enterprises' approximately $4.5 trillion servicing portfolio.[45] Although FHFA does not have express statutory authority to regulate or supervise the servicers, there is no prohibition against the Agency securing such access through contract.[46] As of September 2011, the Enterprises' contract terms and conditions – which FHFA has effectively had the ability to control since it became conservator in September 2008 – did not provide FHFA with access to servicer information or with the ability to ensure that servicers are complying with their servicing contracts.

FHFA should have access to the books and records of the servicers who contract with the Enterprises for the following reasons:

- To Fulfill FHFA's Responsibility of Overseeing the Prudential Operations of the Enterprises. FHFA recognizes its responsibility to supervise the operations of the Enterprises, which rely on servicers to perform a variety of loan management functions. When the Enterprises turn to servicers to perform their responsibilities, the vendors' activities should be subject to the same risk management monitoring that FHFA would perform if the Enterprises were conducting the contracted activities themselves. In other words, the Enterprises' use of servicers to perform servicing functions on their behalf should not diminish the responsibility of FHFA to ensure that those servicing functions are conducted in a safe and sound manner and in compliance with applicable laws.

- To Support Enforcement Actions. FHFA has the authority to take enforcement actions against the Enterprises' mortgage servicers if it has reasonable cause to believe that a servicer is engaging/has engaged/is about to engage in an unsafe or unsound practice in conducting the business of the Enterprises or if a servicer is violating/has violated/is about to violate a law, rule, or regulation. However, FHFA's

---

[45] As conservator of the Enterprises, FHFA – through the Enterprises – has access to the servicers' books and records since the Agency has the powers of Enterprise management. However, once the conservatorships are terminated such access through the Enterprises is not assured, and, yet, it is equally important for FHFA to have this access to servicer records in its supervisory/regulator capacity. Accordingly, FHFA needs to secure direct access through contract or other means during the pendency of the conservatorships.

[46] There is precedent for voluntary inclusion of access provisions for FHFA in the Enterprises' contracts with their vendors. The Enterprises have started incorporating an FHFA access provision in several of their REO contracts. Freddie Mac has not included such provision in any of its servicing contracts.

ability to implement this authority may be impaired without direct access to evidence of unsound practices or non-compliance with applicable standards.[47]

- <u>To Fill Oversight Gaps Associated with Servicers' Activities</u>. Not all servicers are financial institutions necessarily supervised by PFRs. Therefore, without oversight by FHFA, such servicers may be unsupervised.

- <u>To Ensure Safety and Soundness of the Enterprises</u>. Although the PFRs, such as the OCC, FRS, and FDIC, conduct examinations of institutions that service loans for the Enterprises, the objectives of the federal bank regulators' and FHFA's examinations will not always align. The PFRs primarily focus on the safety and soundness of financial institutions (*i.e.*, the servicers), whereas FHFA focuses on the safety and soundness of the Enterprises (and, in its conservator capacity, the preservation and conservation of their assets). For example, FHFA may be interested in acquiring information about servicer controls designed to ensure compliance with Enterprise servicing agreements, but other regulators may consider this area of inquiry to be irrelevant to the subject servicer's safety and soundness. Thus, inclusion of an FHFA access provision in the servicing contracts will strengthen FHFA's supervisory control over the Enterprises and lessen FHFA's reliance on the regulatory efforts of other agencies.

*Reporting Critical Servicer Information*

FHFA also has not issued regulations or guidance requiring the Enterprises to report critical servicer information to FHFA, but the issue is currently under consideration.

Given the Enterprises' significant concentration of risk among a few servicers, FHFA needs to receive timely and relevant information relating to the operation of these servicers. For example, if a servicer is suspended or terminated due to poor performance or noncompliance with guidelines by either Fannie Mae or Freddie Mac, the information should be promptly reported to FHFA. In turn, FHFA should evaluate the report and assess whether the servicer poses a safety and soundness concern and, if so, direct the other Enterprise to take appropriate action.

Reporting this critical information is crucial to FHFA's overall assessment of the Enterprises' risk profiles. As of September 2011, the Enterprises do not share with each other information about servicers even though Fannie Mae and Freddie Mac use more than 300 of the same servicers. Until FHFA requires the Enterprises to share performance and compliance data about

---

[47] Although FHFA has authority to subpoena documents, it cannot subpoena servicers directly except in relation to an ongoing proceeding or investigation. *See* 12 U.S.C. § 4641.

their servicers, FHFA is at risk of not being timely informed of critical information that could impact the Enterprises' safety and soundness.

### Establishing Mortgage Servicing Baseline Requirements

Unlike OCC and FDIC, FHFA has not implemented comprehensive regulations or guidance that ensure the Enterprises clearly understand the potential risks that can arise from relationships with their servicers and that they develop effective risk management strategies. Although FHFA's proposed rule outlining specific requirements for managing credit and counterparty risk is more specific than procedures previously issued by OFHEO and FHFA, it does not provide to the Enterprises comprehensive guidance concerning the monitoring of third parties. For example, even though there is a requirement in the proposed rule for the Enterprises to have appropriately trained and competent personnel to manage credit and counterparty risks, this requirement alone is not sufficient without a robust framework for managing third-party relationship risks. This framework should include a risk assessment to identify and prioritize counterparty risk; proper due diligence to identify and select third-party providers; written contracts that outline duties, obligations, and responsibilities of the parties involved; and ongoing oversight of the third parties and third-party activities. This type of guidance is provided by other federal regulators, such as the OCC and FDIC.[48]

FHFA has not developed comprehensive guidelines because it believes that the Enterprises have the knowledge and expertise to develop sufficient servicing guides. Thus, FHFA relies on them to establish their own minimum mortgage servicing requirements. In 2011, however, FHFA directed the Enterprises to establish requirements for servicing non-performing loans (also known as the Servicing Alignment Initiative). But, FHFA has not required the Enterprises to establish requirements for other aspects of servicing, such as servicing the larger subset of performing loans.[49]

Because the Enterprises have separately developed their own servicing guides, the Enterprises' servicing requirements significantly differ in a number of respects, such as servicing delinquent mortgages. FHFA's Servicing Alignment Initiative, which aspires to align the servicing of delinquent mortgages, is a step in the right direction, but FHFA should assume a more affirmative role in determining the substance of mortgage servicing standards across the board.

---

[48] See, e.g., OCC (OCC Bulletin 2001-47, *Third Party Relationships*) and the FDIC (Financial Institutions Letter-44-2008, *Guidance for Managing Third-Party Risk*).

[49] Activities relating to servicing performing loans include collecting mortgage payments and processing late payments; sending periodic statements to borrowers; maintaining escrow accounts to pay property taxes and insurance; and forwarding payments to mortgage owners.

Relying so heavily upon the Enterprises undermines FHFA's responsibility to ensure their safety and soundness. Additionally, the problems associated with managing the Enterprises' huge loan portfolios are not limited to the servicing of delinquent mortgages.

The Servicing Alignment Initiative pertains solely to the servicing of delinquent mortgages, but FHFA's supervisory efforts would be simplified – and thus its results would likely improve – if the Enterprises' servicing standards were unified generally. According to the Acting Comptroller of the Currency's testimony before Congress, recent mortgage servicing experience highlights the need for uniform standards for mortgage servicing that applies to all facets of servicing loans from closing to payoff.[50] To further this effort, the OCC developed a framework for comprehensive mortgage servicing standards that was shared with the FDIC, FRS, the Bureau of Consumer Financial Protection, and FHFA. Given the Enterprises' expansive foot print in the housing finance system, FHFA should take a more proactive role alongside OCC in pursuing development of comprehensive uniform mortgage servicing standards.

## 2. Improvements Started in 2011 by Freddie Mac to Address Servicer Performance Should Be Followed Through

To its credit, Freddie Mac developed a 2011 Business Plan to better manage higher-risk loans within its portfolio. The plan aspires to achieve lifetime credit loss savings of up to ▮▮▮▮▮ (out of a combined goal of ▮▮▮▮) by having *all* servicers modify ▮▮▮▮ mortgages in an effort to stem foreclosures.[51]

However, only the largest servicers responsible for the substantial majority – ▮▮▮ – of Freddie Mac's loans (based upon UPB) have been targeted for full plan implementation, so far. The estimated net credit savings for the targeted largest servicers is about ▮▮▮▮▮▮; this is significantly lower than Freddie Mac's estimate of total credit loss savings. FHFA-OIG estimates that by implementing the plan among a larger group of servicers – those responsible for the remaining ▮▮▮ of Freddie Mac's portfolio – the Enterprise may achieve additional lifetime credit loss savings. Because any additional credit loss savings may reduce the need for

---

[50] Testimony of John Walsh, OCC's Acting Comptroller, before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, dated February 17, 2011.

[51] Freddie Mac's ▮▮▮▮▮▮ estimate is an "unaudited" figure and has not been verified by Freddie Mac auditors, FHFA, or FHFA-OIG. The figure represents estimated net credit loss savings as determined by Freddie Mac involving *all* of its servicers. The actual credit loss savings may vary from the projected savings since they are dependent on a number of variables/assumptions, which if not realized could impact the achievement of the anticipated benefits projected in its 2011 Business Plan.

Freddie Mac is well positioned to meet or exceed its loan modification targets for its largest servicers. As of September 30, 2011, the actual number of loan modifications completed by Freddie Mac's servicers was ▮▮▮▮▮. However, FHFA-OIG herein accepts Freddie Mac's goals without exhaustively analyzing their development and validity. FHFA-OIG reserves the right to review the development and validity of the goals in a subsequent review.

as much financial support from Treasury, reductions in that support through additional credit loss savings is considered a potential monetary benefit to the United States government.

Each servicer who does business with Freddie Mac agrees to the terms of the Single-Family Seller/Servicer Guide, which contains Freddie Mac's selling and servicing requirements.[52] For the ██ largest servicers who currently service ███ of its portfolio, Freddie Mac now uses account plans. A goal of the Freddie Mac Business Plan is to have account plans in place for an additional ██ servicers, the next largest servicers, who manage an additional ███ of the loan portfolio. However, without account plans, credit loss minimization activities for these ███ servicers are largely unstructured and informal and may not achieve optimum results. Further, Freddie Mac has more than ████ smaller servicers that manage the remaining ███ of its loan portfolio, and the Enterprise does not currently anticipate assigning account plans to these servicers. Although specific account plans for these smaller servicers may not be practical, establishment and communication of performance goals or metrics to increase foreclosure alternative activities together with related performance reporting could augment savings from reduced credit losses.

To maximize the credit loss savings, FHFA should require Freddie Mac to implement its Business Plan for all of its servicers by:

- Requiring Freddie Mac to establish servicer account plans for the ██ next-largest servicers that do not have active account plans; and

- Taking steps, to the extent practicable, to maximize the credit loss savings for the more than ████ smaller servicers not under consideration for account plans.

## 3. FHFA's Examination Coverage of Freddie Mac's Oversight and Risk Management of Counterparties Needs Improvement

FHFA needs to improve its supervision of Freddie Mac's oversight and risk management of its servicers. As early as 2008, FHFA had information indicating that mortgage servicing represented a heightened risk to the Enterprises, but it did not take timely or appropriate action to address these indicators. Further, when FHFA commenced its examination coverage beginning in 2010, it did not adequately assess the operational risks posed by Freddie Mac's mortgage servicing contractors, and it did not consider reports of examination, enforcement actions, and servicer reviews conducted by other Federal agencies.

---

[52] Available at http://www.freddiemac.com/sell/guide.

Although FHFA monitored performance of servicers in 2008 and 2009 through continuous supervision activities, FHFA did not devote added attention to the issue, by initiating special projects, until August 2010.

FHFA officials explained that it did not focus examination attention on mortgage servicing prior to 2010 because the Agency faced a number of challenges that led it to focus on other priorities. FHFA focused on the Making Home Affordable programs throughout 2009, and its Division of Enterprise Regulation (DER) staff devoted complementary examination resources to other, high-risk credit issues related to bond guarantees and mortgage insurance. But from 2008 onwards, FHFA was aware of indicators suggesting that mortgage servicing represented an escalating risk to the Enterprises.[53] These indicators included:

- Substantial Increase in Delinquency Rates. Through its off-site monitoring activities, FHFA noted a substantial increase in the number of the Enterprises' delinquent loans starting in 2008.

- Mortgage Servicers' Performance. Through the Office of Credit Risk's (OCR) continuous supervision of Freddie Mac's single-family business line, FHFA became aware of servicers' poor performance as early as the first quarter of 2009. Later, in the fourth quarter of 2009, OCR drafted an analysis memorandum – reflecting the results of its continuous supervision – stating that the majority of Freddie Mac's servicers (including its ▮▮▮▮▮▮▮ servicers) were performing below expectations.

- Weak Counterparty Risk Management. During OCR's continuous supervision of Freddie Mac's single-family business line, FHFA also determined that counterparty risk management at the Enterprise was weak. Examples of weaknesses noted include: (a) staff with weak analytical skills; (b) counterparty analysis without benchmarking; (c) inaccurate exposure calculations used to determine compliance with counterparty limits; and (d) lack of many basic analyses to support critical decisions. FHFA noted the need to strengthen Freddie Mac's organization structure of counterparty credit risk and overall counterparty credit risk management function to ensure early identification of troubled counterparties and articulation of robust action plans. In Freddie Mac's 2009 Report of Examination, FHFA reported that:

    > Enterprise management continues to struggle with assigning accountability and developing an organizational structure that

---

[53] FHFA-OIG recognizes that FHFA has a finite staff and has to make judgments about priorities. Nonetheless, FHFA-OIG could not assess the basis for FHFA's decision to defer more focused examinations/special projects of mortgage servicing because the Agency did not document its decision-making process.

facilitates the effective execution of defined roles and responsibilities of the chief enterprise risk officer.... During 2009, the Board acted on a FHFA recommendation and authorized the creation of a new chief credit officer....[54]

Audit reports issued by Freddie Mac's Internal Audit Department and submitted to FHFA corroborated that there were weaknesses in Freddie Mac's oversight of its counterparties. For example, the Internal Audit Department completed a review of the management of troubled counterparties in response to the Taylor, Bean & Whitaker Mortgage Corp. (TBW) fraud case.[55] In its report, dated May 2010, the Internal Audit Department stated that Freddie Mac needs to:

- Develop and document a more robust comprehensive framework to identify troubled servicers;

- Establish a separate governance and oversight process for troubled counterparties;

- Improve procedures to terminate troubled servicers; and

- Strengthen controls and management over all counterparties.

In sum, FHFA could have done more in response to the foregoing indicators of heightened risk.

*FHFA's Assessment of Freddie Mac's Third-Party Risk*

### Internal Reviews

When FHFA began to devote more resources to servicing in 2010, it did not adequately assess the risk that servicers pose to Freddie Mac. From January 2010 to May 2011, FHFA initiated five reviews (four special projects and one continuous supervision project) that are directly related to the operational aspects of servicing, as follows:

- In August 2010, FHFA initiated a special project to determine if the Enterprises were assessing penalties against servicers that did not comply with foreclosure timelines;

- In April 2011, FHFA started a continuous supervision activity to review Freddie Mac's oversight of its servicers; and

---

[54] This issue was also discussed in FHFA's 2009 Report to Congress.

[55] The TBW case is among the largest mortgage fraud cases in American history. Freddie Mac reported losses and filed a proof of claim of nearly $1.8 billion in TBW's bankruptcy proceeding.

- In late 2010/early 2011, FHFA initiated three other activities to review Freddie Mac's oversight of its servicers.[56]

Based upon FHFA-OIG's analysis of these five reviews, we concluded that the reviews did not provide a comprehensive and meaningful assessment of the potential risks that could arise from the use of servicers. Further, FHFA-OIG determined that FHFA's procedures were not designed to address Freddie Mac's processes and controls for overseeing, managing, and controlling third-party relationships. Additionally, Agency examiners did not implement the examination procedures outlined in FHFA's Third Party Relationship Management and Reference Procedures Manual.

### External Reviews

FHFA also did not consider and use critical financial and non-financial information received from other PFRs when assessing the overall risk profiles of the Enterprises. For example, FHFA did not consider reports of examination and enforcement actions taken against servicers (many of whom service loans for Freddie Mac) by the PFRs, or servicing reviews completed by other federal agencies, as follows:

- <u>Reports of Examination and Enforcement Actions</u>. FHFA has not been proactive in reviewing reports of examination completed by the PFRs or enforcement actions taken by them. Although FHFA has established Memoranda of Understanding (MOUs) with OCC, FDIC, FRS, and OTS that allow them to share reports of examinations and enforcement actions with FHFA, the Agency has not utilized the MOUs in furtherance of its supervisory responsibilities. Indeed, FHFA's senior DER officials advised that they were unaware of the Agency's MOUs with the various federal agencies, except for the MOU with OCC. Thus, they were not aware that external examination reports were available to them. By reviewing these reports, FHFA can identify which financial institutions are performing poorly and pose a risk to the Enterprises.

  FHFA also does not coordinate with the PFRs to ensure that financial institutions address the servicing deficiencies cited in external enforcement actions. For example, OCC, FRS, OTS, and FDIC recently issued enforcement actions against 14 federally regulated servicers as a result of their interagency review of foreclosure policies and practices. Although all of the servicers work for Freddie Mac (13 of the 14 also work

---

[56] These three activities include: (1) a special project reviewing Freddie Mac's retained attorney network (initiated in October 2010); (2) a special project identifying and evaluating operational risk in the Home Affordable Modification Program (initiated in November 2010); and (3) a special project reviewing Freddie Mac's process for ensuring that servicers maintain proper insurance coverage (initiated April 2011).

for Fannie Mae), FHFA had no plans to play a role in ensuring that the servicers comply with the enforcement actions. According to an FHFA official, because FHFA does not regulate the servicers, the Agency is not responsible for ensuring that the servicers develop sufficient corrective action plans to address the servicing deficiencies cited in the enforcement actions. Given the concentration of risk exposure with these servicers, FHFA should be more involved in ensuring that the servicers correct the deficiencies cited in the enforcement actions.

- <u>Servicing Reviews Performed by Other Federal Agencies</u>. FHFA has not researched or monitored relevant servicing reviews completed by other federal agencies. Although FHFA established MOUs with the Farm Credit Administration, Securities and Exchange Commission, and HUD to facilitate the sharing of information, FHFA has not utilized the MOUs to obtain these agencies' servicing reviews of servicers working for the Enterprises.

# CONCLUSION

Mortgage servicing is a critical element of the Enterprises' business operations. Recently, various factors, including the surge in delinquencies and foreclosures in the Enterprises' loan portfolios and the concentration of servicing responsibilities among a few large financial institutions, have converged to raise significant supervisory concerns. To address these concerns, FHFA needs to enhance regulations or guidance regarding counterparty oversight and risk management and to implement more effective monitoring of Freddie Mac's oversight of its mortgage servicers. Although FHFA and Freddie Mac have taken several positive steps to strengthen mortgage servicing, FHFA needs to improve its supervision of Freddie Mac's servicing operations so that risks associated with the servicers' operational activities are sufficiently mitigated and addressed.

Further, Freddie Mac developed a 2011 Business Plan to, among other things, improve mortgage servicing. The plan estimated approximately ▮▮▮▮▮▮ in lifetime credit loss savings by reducing potential credit-related losses through more active servicing. However, Freddie Mac did not fully implement its plan. FHFA is in a position to cause Freddie Mac to achieve additional credit loss savings by implementing its plan among a larger cross-section of its servicer network.

# RECOMMENDATIONS

FHFA-OIG recommends that DER:

1. Establish and implement more robust regulations or guidance governing counterparty oversight and risk management for mortgage servicing. The regulations or guidance should include requirements for: (a) contracting with servicers, including a contractual provision authorizing FHFA's access to relevant servicer information; (b) promptly reporting on material poor performance and non-compliance by servicers; and (c) minimum, uniform standards for servicing mortgages owned or guaranteed by the Enterprises.

2. Direct Freddie Mac to take the necessary steps to monitor and track the performance of it servicers to reasonably assure achievement of credit loss savings by: (a) implementing servicer account plans for the servicers without account plans that are under consideration to receive a plan; and (b) taking action to maximize credit loss savings among the remaining servicers that are not under consideration for account plans.

3. Improve its existing procedures and controls governing coordination with other federal agencies that have oversight jurisdiction with respect to the Enterprises' mortgage servicers.

# SCOPE AND METHODOLOGY

The objective of this performance audit was to assess whether FHFA has an effective supervisory control structure and sufficient examination coverage and oversight activities to adequately and timely identify and mitigate risks related to Freddie Mac's mortgage servicing contractors. The audit scope was from January 1, 2010, through May 31, 2011, and was expanded as necessary. FHFA-OIG also reviewed relevant data for the period July 2008 to December 2009 to obtain a historical perspective. While FHFA-OIG focused on FHFA's supervision of Freddie Mac, FHFA-OIG also performed a limited review of Fannie Mae's servicing oversight.

Audit field work was performed from June 2011 through July 2011. The audit was conducted at FHFA's three offices located in Washington, DC. Computer processed data were used for background purposes only and not to support audit conclusions. To achieve its objective, FHFA-OIG conducted the following:

- Reviewed the supervisory controls established by FHFA including guidance and direction to the Enterprises and examination policies and procedures related to mortgage servicing;

- Evaluated Freddie Mac's policies and procedures related to oversight of mortgage servicers;

- Assessed the quality of FHFA's annual and quarterly risk assessment processes;

- Reviewed steps taken by FHFA to mitigate concentration risks among the top four servicers and other risks associated with servicers that had heighten supervisory concerns; and

- Interviewed FHFA and Freddie Mac officials on their views and the extent and level of oversight provided over mortgage servicing contractors.

FHFA-OIG assessed the internal controls related to its audit objective. Internal controls are an integral component of an organization's management that provide reasonable assurance that the following objectives are achieved:

- Effectiveness and efficiency of program operations;

- Reliability of financial reporting; and

- Compliance with applicable laws and regulations.

Internal controls relate to management's plans, methods, and procedures used to meet its mission, goals, and objectives, and include the processes and procedures for planning, organizing, directing, and controlling program operations as well as the systems for measuring, reporting, and monitoring program performance. Based on the work completed on this performance audit, FHFA-OIG considers weaknesses in FHFA's supervision of Freddie Mac's risk management and oversight of mortgage servicing contractors to be a significant deficiency within the context of the audit objective. Additionally, FHFA-OIG identified other less significant matters that came to its attention during the audit. These matters were communicated separately in writing to FHFA in an audit memorandum.

FHFA-OIG conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that audits be planned and performed to obtain sufficient, appropriate evidence to provide a reasonable basis for FHFA-OIG's findings and conclusion based on the audit objective. FHFA-OIG believes that the evidence obtained provides a reasonable basis for the findings and conclusion included herein, based on the audit objective.

# APPENDIX A

*FHFA's Comments on Findings and Recommendations*

 **Federal Housing Finance Agency**

## MEMORANDUM

TO:    Russell Rau
        Deputy Inspector General for Audits

FROM:   Jon Greenlee
        Deputy Director
        Division of Enterprise Regulation

SUBJECT:  Inspector General Report on FHFA's Supervision of Freddie Mac's Controls over
           Mortgage Servicing Contractors, AUD-2011-006

DATE:   February 29, 2012

The purpose of this memorandum is to provide you with FHFA's response to your recommendations outlined in the Inspector General Report on FHFA's Supervision of Freddie Mac's Controls over Mortgage Servicing Contractors. FHFA appreciates the opportunity to provide its response and values the feedback the Agency receives from the Inspector General and opportunities to enhance our operations. FHFA agrees that mortgage servicing is a critical area and we have made mortgage servicing a top priority of the agency. FHFA has taken a number of steps both through supervision of the Enterprises and by establishing policies to improve industry practices. Most importantly, FHFA's Servicing Alignment Initiative (SAI) has established an unprecedented level of consistency in mortgage servicing processes at both Enterprises and requires more aggressive foreclosure prevention activities on the part of servicers, a set of policy changes that positively affects homeowners and serves as a model for the broader financial services industry.

FHFA's supervision of Freddie Mac has been proactive and continues to evolve as issues in the housing market continue to develop. For example, the Agency conducted special reviews and targeted exams in this area, and engaged in broad servicing policy work and Interagency discussions related to servicer issues and oversight. In addition, the Agency is expanding the dedicated team of examiners that are onsite at the Enterprises. The team will have experienced staff that will, among other activities, monitor counterparty risk management at both Enterprises and provide for a focused, ongoing understanding of current and emerging risks and the effectiveness of risk management practices. Although FHFA has historically had a clear understanding of the counterparty risk at both Enterprises, FHFA recognized that a dedicated examination staff to monitor and coordinate oversight activities would enhance the Agency's overall efficiency and effectiveness. This enhancement in supervisory approach will also provide third party reviewers such as the OIG with a clearer understanding of how FHFA coordinates supervisory activities in this and other important areas of the Enterprises.

FHFA's response to the OIG recommendations follows:

Recommendation 1: Establish and implement more robust regulations or guidance governing counterparty oversight and risk management for mortgage servicing. The regulations or guidance should include requirements for: (a) contracting with servicers, including a contractual provision authorizing FHFA's access to relevant servicer information; (b) promptly reporting on material poor performance and non-compliance by servicers; (c) minimum, uniform standards for servicing mortgages owned or guaranteed by the Enterprises.

Management Response:

The report outlines three areas that FHFA needs to address to strengthen its supervision of the Enterprises' counterparty risk management. The three areas – contracting with counterparties, reporting critical servicer information, and establish mortgage servicing baseline requirements – are addressed separately below.

1(a) Regulations or guidance on contracting with servicers, including a contractual provision authorizing FHFA's access to relevant servicer information.

FHFA partially agrees with this recommendation. FHFA will evaluate the merits of seeking a legislative change to provide the Agency with the same legal examination authority and rights as the federal banking agencies have with respect to entity affiliated parties. In the meantime, FHFA will take additional steps, when the Enterprises contracts allow for FHFA reviews of third parties, focusing on those key servicers that have not been subject to supervision by a primary federal regulator (PFR). In addition, FHFA will continue to conduct reviews of third parties when appropriate. For example, FHFA is in the process of conducting a review of a key third party provider for one of the Enterprises. FHFA will address the components of this recommendation over the next year and will have a final status update by January 31, 2013.

1(b) Regulations or guidance on promptly reporting on material poor performance and non-compliance by servicers.

FHFA agrees with this recommendation and will establish a framework for sharing critical information reported by one Enterprise with the other to ensure appropriate action is taken. The framework must consider various requirements such as compliance with laws and regulations, consistency with risk based supervision, effectiveness of the Enterprises risk management processes, and operational considerations. The analysis and the establishment of a new policy will be completed by September 30, 2012.

1(c) Regulations or guidance on minimum uniform standards for servicing mortgages owned or guaranteed by the Enterprises.

FHFA agrees with the recommendation that the Agency continues to be proactive and maintains its leadership role in pursuing more uniform mortgage servicing standards, and will develop a status report on on-going initiatives by September 30, 2012, with a final

status update by January 31, 2013. As the report notes. FHFA issued a supervisory directive in February 2011 requiring the Enterprises to align their guidelines for servicing delinquent mortgages. FHFA's Servicing Alignment Initiative (SAI) established an unprecedented level of consistency in mortgage servicing processes that requires enhanced foreclosure prevention that would not have been achieved through the issuance of a supervisory policy. In addition. the Agency has been actively providing guidance to the Enterprises through not only the SAI. but through examinations, conservatorship operations, and policy initiatives such as penalty assessment, HAMP, HARP, and servicer compensation.

Recommendation 2:  Direct Freddie Mac to take the necessary steps to monitor and track the performance of its servicers to reasonably assure achievement of credit loss savings by: (a) implementing servicer account plans for the servicers without account plans that are under consideration to receive a plan; and (b) taking action to maximize the credit loss savings among the remaining servicers that are not under consideration for account plans.

Management Response:

FHFA agrees with this recommendation. FHFA. through its supervisory and policy making processes, has clearly outlined the Agency's expectations that Freddie Mac take appropriate steps to maximize credit loss savings in a cost effective and prudent manner. Since 2009, FHFA has been engaged with both Enterprises focusing on improving servicing performance, both through the supervision process and by proactively providing servicing standards and related servicing performance guidance to the Enterprise. These efforts have already resulted in a more effective process for overseeing servicer performance. which includes the establishment of scorecards, standards, and key performance indicators that support reasonable achievement of estimated credit loss savings.

As noted above, FHFA has made clear its expectations that Freddie Mac maximize its credit loss savings in a cost effective and prudent manner.

2(a) The establishment of detailed account servicer plans for the servicers without account plans that are under consideration to receive a plan.

Through its ongoing supervisory process, FHFA will continue to make Freddie Mac's oversight of servicers a key priority to determine if risks are being properly managed and that credit loss savings are reasonable achieved, including whether account servicer plans for these servicers is appropriate and cost effective. This will be an ongoing effort of FHFA that will be completed by January 31, 2013.

2(b) Taking action to maximize the credit loss savings among the remaining servicers that are not under consideration for account plans.

As noted above, FHFA has and will continue to make this a top priority throughout 2012. Our supervisory process during 2012 will monitor and assess the Enterprise's processes

and effectiveness to assure that credit loss savings are reasonably achieved that will be completed by January 31, 2013.

Recommendation 3: Improve its existing procedures and controls governing coordination with other federal agencies that have oversight jurisdiction with respect to the Enterprises' mortgage servicers.

Management Response:

FHFA agrees to this recommendation and will take additional steps to improve the flow of information as appropriate to support FHFA's supervision of the Enterprises.    Going forward, FHFA will evaluate in its supervision of the Enterprises, findings outlined in reports of examination and enforcement actions taken against servicers by the PFRs, or servicing reviews completed by other federal agencies. Furthermore, the report outlines the need for increased awareness among senior staff of the Agency of the existing Memoranda of Understanding (MOUs) with the OCC, FDIC, Federal Reserve, and OTS that allow for examination and enforcement action information to be shared with FHFA. FHFA is an active participant in interagency discussions and has a sound understanding of the issues at the servicers supervised by the PFRs, but will evaluate how to best establish a framework for obtaining reports of examination and enforcement actions under the existing MOUs with the PFRs, FCA, SEC, and HUD. To improve the flow of information, FHFA will develop and internally distribute a consolidated framework of coordination mechanisms and capabilities available to the agency by September 30, 2012.

# APPENDIX B

*FHFA-OIG's Response to FHFA's Comments*

On December 20, 2011, FHFA-OIG provided a draft of this report to FHFA for comment. FHFA-OIG received a written response, dated February 29, 2012. FHFA-OIG has attached FHFA's full response (*see* Appendix A of this report), which was considered where appropriate in finalizing this report. Appendix C provides a summary of the Agency's response to FHFA-OIG's recommendations and the status of agreed-to corrective actions.

FHFA fully agreed with the recommendations, except for Part (a) of Recommendation 1. Additionally, although the Agency agreed with Part (c) of Recommendation 1, FHFA-OIG considers FHFA's planned corrective actions nonresponsive and, accordingly, Parts (a) and (c) of Recommendation 1 are considered unresolved.

Below, FHFA-OIG summarizes its evaluation of FHFA's comments on Parts (a) and (c) of Recommendation 1.

## Recommendation 1(a)

FHFA partially agreed with Part (a) of Recommendation 1. FHFA stated that it will evaluate the merits of seeking a legislative change to give it the same legal examination authority and rights as PFRs with respect to servicers. In the interim, FHFA indicated it will focus on servicers that are not supervised by a PFR if the Enterprises' contracts allow FHFA to review third-parties.

Oversight of servicers that are not otherwise regulated at the federal level is an important step. While seeking a legislative change can give FHFA specific statutory access authority to servicers, FHFA-OIG has found no prohibition against securing FHFA access to servicers for purposes of fulfilling its Enterprise regulatory and supervisory responsibilities through servicing contracts. In particular, as conservator, FHFA can direct the Enterprises to obtain such access. Accordingly, pending legislative changes, FHFA should require that an access provision be included in the Enterprises' servicing contracts.

During the exit conference, FHFA also expressed concern that having access to servicers may intrude on other PFRs' authority. However, the intent of FHFA-OIG's recommendation was that FHFA, like the Enterprises, requires access rights to servicers' books and records in order to fulfill its mission of ensuring the safety and soundness of the Enterprises. This differs in important respects (such as potentially competing financial interests) from the role of the PFRs related to financial institutions that happen also to be servicers for the Enterprises.

FHFA-OIG also noted that FHFA's comments did not address Part (a) of Recommendation 1 related to establishing guidance or regulations for contracting with servicers.

### Recommendation 1(c)

Also, although FHFA agreed with Part (c) of Recommendation 1, the Agency's description of the planned actions does not clearly address the recommendation's intent. FHFA indicated that it will be proactive and maintain a leadership role in pursuing more uniform mortgage servicing standards. In addition, FHFA stated that it will develop a status report for ongoing initiatives by September 30, 2012, with a final status update by January 31, 2013. FHFA also noted actions to implement the Servicing Alignment Initiative, which provides consistent requirements for servicing non-performing loans. While commendable, FHFA's response did not provide specific action plans for implementing uniform standards for the Enterprises' servicers on other aspects of servicing as FHFA-OIG recommended.

Consequently, FHFA-OIG considers FHFA's comments to Parts (a) and (c) of Recommendation 1 to be nonresponsive and the recommendations unresolved, and requests the Agency reconsider its position and provide revised comments within 30 calendar days.

# APPENDIX C

*Summary of Management's Comments on the Recommendations*

This table presents management's response to the recommendations in FHFA-OIG's report and the status of the recommendations as of the date of report issuance.

| Rec. No. | Corrective Action: Taken or Planned | Expected Completion Date | Monetary Benefits ($ Millions) | Resolved: "Yes or No | Open or Closed" |
|---|---|---|---|---|---|
| 1. | a. FHFA will evaluate the merits of seeking a legislative change to provide it with the same legal examination authority and rights as the PFRs. While evaluating the merits, FHFA will take steps to focus on the servicers that are not under the supervision of a PFR provided that the Enterprises' contracts allow FHFA to review third-parties. | a. 1/31/13 | $0 | No | Open |
|  | b. FHFA will establish a framework for sharing critical information reported by one Enterprise with the other Enterprise and ensure appropriate action is taken. | b. 9/30/12 |  | Yes | Open |
|  | c. FHFA will maintain a leadership role in pursuing more uniform servicing standards and develop a status report of on-going initiatives by 9/30/12, with a final status update by 1/31/13. | c. 1/31/13 |  | No | Open |
| 2. | FHFA will make Freddie Mac's oversight of servicers a key priority to determine if risks are being managed properly and ensure that credit loss savings are | 1/31/13 | To be determined through further monitoring.[57] | Yes | Open |

---

[57] Recommendations that funds be put to better use are estimates of amounts that could be used more efficiently if an FHFA-OIG recommendation is implemented. These amounts include reductions in outlays, deobligation of funds, withdrawal of interest, costs not incurred by implementing recommended improvements, avoidance of unnecessary expenditures noted in preaward reviews, and any other savings that are specifically identified. In these

| | | | | | |
|---|---|---|---|---|---|
| | reasonably achieved, to include determining whether it is appropriate and cost effective for the Enterprise to develop account plans for the servicers that currently do not have account plans. | | | | |
| 3. | FHFA will establish a framework for obtaining reports of examination and enforcement actions from the PFRs and other federal agencies and evaluate the findings outlined in their reports and enforcement actions as part of its supervision of the Enterprises. | 9/30/12 | $0 | Yes | Open |
| Total | | | **To be determined through further monitoring.** | | |

a Resolved means – (1) Management concurs with the recommendation, and the planned, ongoing, and completed corrective action is consistent with the recommendation; (2) Management does not concur with the recommendation, but alternative action meets the intent of the recommendation; or (3) Management agrees to the OIG monetary benefits, a different amount, or no ($0) amount. Monetary benefits are considered resolved as long as management provides an amount.

b Once the OIG determines that the agreed-upon corrective actions have been completed and are responsive to the recommendations, the recommendations can be closed.

---

instances, if FHFA implements an FHFA-OIG recommendation, Freddie Mac will reduce its credit losses associated with mortgage servicing by its servicers. FHFA-OIG will monitor achievement of credit loss savings through its audit follow-up process.

# ADDITIONAL INFORMATION AND COPIES

For additional copies of this report:

- Call the Office of Inspector General (OIG) at: 202-730-0880

- Fax your request to: 202-318-0239

- Visit the OIG website at: www.fhfaoig.gov

To report alleged fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

- Call our Hotline at: 1-800-793-7724

- Send complaints via facsimile to: 202-318-0358

- E-mail us at: oighotline@fhfaoig.gov

- Write to us at: FHFA Office of Inspector General
  Attn: Office of Investigations – Hotline
  400 7th Street, SW
  Washington, DC 20024